## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No: 14 B 36424 |
| | ) | |
| CHARLES V. COOK, SR., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Judge LaShonda A. Hunt |

## <u>MEMORANDUM OPINION</u>

This matter is before the court for ruling following an evidentiary hearing on motions for sanctions and examination of fees filed by Patrick S. Layng, the United States Trustee for Region 11 ("UST"), against Law Solutions Chicago LLC d/b/a Upright Law LLC ("Upright"), Jason Allen ("Allen"), Kevin Chern ("Chern"), and David Gallagher ("Gallagher").[1]  Allen and Chern were principal owners/managers of Upright; Gallagher was the Upright attorney who represented debtor Charles V. Cook, Sr. ("Cook") in this chapter 7 proceeding.  The UST alleges that Upright engaged in a pattern and practice of inaccurate disclosures of Federal Debt Collections Practices Act (FDCPA) litigation in violation of 11 U.S.C. § 526, and that Allen, Chern, and Gallagher provided deficient legal services to Cook.  Respondents concede that pertinent details about pending and settled FDCPA lawsuits were omitted from bankruptcy schedules and statements in multiple cases—including this one—but nonetheless assert that sanctions are not warranted.  Following protracted discovery, a three-day trial was conducted.  The parties subsequently filed post-trial submissions.  This decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.  For the reasons that follow, sanctions will be imposed as set forth herein.

---

[1] Upright, Allen, Chern, and Gallagher, are collectively referred to as "Respondents."

# BACKGROUND[2]

Jason Allen purchased Law Solutions Chicago LLC ("LSC")[3] around July 2010. (Stip. ¶ 47). At that time, LSC had two attorneys and focused exclusively on representing bankruptcy debtors in the Chicago market. (*Id.*). Prior to the LSC acquisition, Allen practiced consumer bankruptcy law for four years, preparing petitions for thousands of debtors; and he managed several of his former law firm's satellite offices. (*Id.* ¶¶ 101–02). As LSC President and Chief Operating Officer, Allen eventually expanded operations to Illinois, Michigan, Indiana, and Arizona. He left the firm in July 2018. (Stip. ¶¶ 48, 92, 103; Jason Allen Tr. Test., Dec. 19, 2018, Dkt. #148 at 143–44).

In October 2013, Kevin Chern became the Managing Partner at LSC; he had purchased 70% of the firm's shares, leaving Allen with about a 30% ownership interest. (Stip. ¶¶ 49, 91; Allen at 143). Chern brought to the business twenty years of experience as a consumer bankruptcy lawyer, law firm manager, and operator of an online marketing company. (Stip. ¶ 99). Around the same time that Chern joined LSC, the firm expanded its practice to include representation of clients as plaintiffs in suits brought under the FDCPA and similar state statutes (the "FDCPA Practice"). (*Id.* ¶ 50). Upright Litigation LLC was subsequently formed in March 2014; a few months later, LSC began to operate under the names "Upright Law" or "Upright Law LLC." (*Id.* ¶¶ 51, 53). Allen and Chern managed both entities—Upright Litigation and Upright Law—in the same physical office space as LSC. (*Id.* ¶¶ 52, 55). For purposes of this

---

[2] The following facts are drawn from the pretrial stipulations, trial testimony and admitted evidence. The court also takes judicial notice of the dockets and public pleadings in the bankruptcy cases referenced in these proceedings. *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989); (Pretrial Stmt., Stip. ¶ 1, Dkt. #158)("Stip.").

[3] LSC and Upright are used interchangeably throughout this case but refer to the same entity.

matter, the parties agree that Upright Litigation and Upright Law can be treated as one in the same. (*Id.* ¶ 54).

Chern described Upright as one of the largest consumer bankruptcy firms in the United States, with approximately 100 employees in Chicago and 350 partner attorneys across the country. (Kevin Chern Tr. Test., Dec. 18, 2018, Dkt. #147, ("Chern, Day 1") at 153–54). By the end of 2018, Upright had filed over 34,000 bankruptcy petitions. (*Id.* at 154). The FDCPA practice ended in late 2015/early 2016 due to unprofitability. (David Leibowitz Tr. Test., Dec. 20, 2018, Dkt. #149, at 22). Annual revenues at Upright steadily increased from $18.8 million in 2016 to $28 million in 2018. (Ryan Galloway Tr. Test., Dec. 20, 2018, Dkt. #149, at 192–94). With Allen's departure, Chern holds a 99% membership interest in the firm. (Chern, Day 1 at 148). Chern continues to manage day-to-day operations of the business, but he also appointed a management committee to develop policies and procedures for the firm. (*Id.* at 149–51). Some changes have been implemented as a result of various sanctions motions filed against Upright. At issue here is the appropriate redress for the firm's admitted past failures to fully disclose FDCPA litigation in bankruptcy filings.

## I.   Development of the FDCPA Practice

David Levin ("Levin") joined Upright on June 9, 2014, as partner and head of Consumer Rights Litigation. (Stip. ¶ 56; David Levin Tr. Test., Dec. 20, 2018, Dkt. #149, at 69, 71). Levin recalled the firm having only a few pending FDCPA cases and motions for violations of the automatic stay or discharge injunction at that time. (Levin at 71). His role was to manage and expand the consumer protection litigation practice and implement processes for handling those matters. (*Id.* at 70–71). Levin left Upright in January 2016; shortly thereafter, the litigation

group disbanded. (*Id.* at 97, 99). But he estimated that during his two-year tenure, Upright filed at least a few hundred consumer protection claims nationally. (*Id.* at 92, 124–25).

Levin worked closely with David Leibowitz ("Leibowitz"), who had joined the firm a few months earlier to run the litigation practice. (Leibowitz at 4–5, 16–18). Leibowitz has held various titles at LSC, including General Counsel, Chief Legal Officer, and Senior Legal Advisor.[4] (Stip. ¶ 93). Since Leibowitz was an experienced chapter 7 Trustee in the Northern District of Illinois, he assumed responsibility for the bankruptcy-related litigation matters while Levin oversaw the FDCPA cases. (Leibowitz at 17, 51–52; Levin at 71–72). Upright had a bankruptcy group that operated separately from the litigation team; and, although housed in the same office, was supervised by Allen and Chern. (Levin at 76, 79; David Gallagher Tr. Test., Dec. 18, 2018, Dkt. #147, at 24–25).

David Gallagher was hired by Upright as a senior bankruptcy associate in November 2013. (Stip. ¶¶ 77–78). Like Allen and Chern, Gallagher already had several years of consumer bankruptcy experience; consequently, he filed the majority of Upright's bankruptcy petitions. (*Id.* at ¶¶ 80–81; Gallagher at 20). Gallagher was eventually promoted to partner in July 2018, but he voluntarily left the firm four months later, just prior to this matter going to trial. (Gallagher at 22). Gallagher explained that the bankruptcy group used BKSN, a case management software system, to track its bankruptcy cases until February 2015 when the firm switched to SalesForce, a different software system. (*Id.* at 57–58). He believed that the existence of FDCPA litigation was to be notated in BKSN with a flag or in SalesForce via a specific entry in the notes. (*Id.* at 36, 110–11). In contrast, the litigation group used Clio, another case management software system, to track the required steps for each matter. (Levin at 81–82). Levin testified that alerting

---

[4] Leibowitz also holds a 1% membership interest in Upright. (Leibowitz Test. at 4).

the bankruptcy department about a possible FDCPA claim was not one of the listed tasks in Clio

and that he did not have regular access to BKSN or SalesForce since he did not work on

bankruptcy cases. (*Id.* at 81–82, 104–05). Instead, Levin understood from Chern that litigation

paralegal Brandy Elliott ("Elliott") would make specific notations in the bankruptcy software

system once Upright had been retained for an FDCPA litigation matter, in order to alert the

bankruptcy attorney to contact Levin's department to discuss the potential claim before filing a

petition. (*Id.* at 78–79, 83, 95, 103).

Chern similarly testified that the policy and procedure in 2014 was for a litigation

paralegal to notate the client's customer relationship management record with a flag to indicate

Upright's representation on a consumer protection claim. (Chern, Day 1 at 213). Additionally,

Chern stated, FDCPA attorneys were supposed to directly email the bankruptcy attorney, and

both Levin and Leibowitz were aware of this fact. (*Id.*). But Levin said he was never told to

email the bankruptcy group. (Levin at 95–96). Likewise, Leibowitz could not recall any specific

requirement for the litigation group to either make notations in bankruptcy software or email the

assigned bankruptcy attorney about a case. (Leibowitz at 26–28).

However, Leibowitz did specifically raise with Chern the need to ensure that potential

litigation claims were properly disclosed in bankruptcy filings, as Upright had many consumer

protection case leads coming in from paralegals talking to bankruptcy clients. (*Id.* at 44–45).

Consequently, in the spring of 2014, Leibowitz suggested that Upright begin generically

disclosing a potential FDCPA claim on every debtor's schedules. (Stip. ¶ 60). This "Every Case

Practice" was based on Leibowitz's belief that a possible FDCPA claim should be listed as an

asset in every bankruptcy case, whether such a claim was known to exist or not, since Upright

was always attempting to identify such claims. (*Id.*). The possible claim would then be

scheduled as fully exempt. (Stip. ¶ 60). Upright bankruptcy filings by Gallagher reflected consistent application of the practice from March through June of 2014. (Stip. ¶ 62; UST Tr. Ex. 97-1). But after case trustees throughout the United States took issue with the scheduling of claims that had not been verified, the practice was discontinued around June 2014. (Stip. ¶¶ 60–61).

Upright advertised the FDCPA Practice in publications such as the Consumer Bankruptcy Journal, the official publication of the National Association of Consumer Bankruptcy Attorneys. (Stip. ¶ 59). The Spring 2015 issue included one such advertisement, describing Upright as a "Nationwide Consumer Protection and Bankruptcy Litigation Law Firm" that provided "one place to refer all . . . consumer protection matters." (UST Tr. Ex. 86). The benefits of partnership included "generous referral fees" and "accelerate[d] payment of your bankruptcy fees by applying client's proceeds of FDCPA settlements" while "generat[ing] cost free revenue from your existing client base." (*Id.*). Potential partner attorneys were encouraged to contact Chern for more information on how to "add this revenue stream to their practices." (*Id.*).

Levin confirmed the majority of litigation leads came from existing Upright bankruptcy clients. (Levin Test. at 72–73). Chern also believed most of their clients were receiving calls that violated consumer protection laws. (Chern, Day 1 at 221–22). Consequently, Upright regularly sent automated emails to all bankruptcy clients encouraging them to contact the firm to report such incidents. (Allen at 153; UST Tr. Ex. 24). Additionally, Upright promoted the FDCPA practice on its website and informed bankruptcy clients of the option through scripted statements of "client consultants" during telephone calls. (Stip. ¶ 57). In early 2014, Upright developed and provided to clients a "Stop Collection Harassment Action Log" to help track creditor calls

they were receiving. (Kevin Chern Tr. Test., Dec. 19, 2018, Dkt. #148 ("Chern, Day 2") at 73–74; Upright Tr. Ex. 19).

## II.   Representation of Charles V. Cook, Sr.

### A. Chapter 7 Bankruptcy Proceedings

Cook initially contacted LSC on the internet in the spring of 2013 to inquire about filing for bankruptcy. (Stip. ¶ 2). He later had an in-person meeting with a paralegal who explained what a bankruptcy would entail and how much it would cost. (Charles Cook Tr. Test., Dec. 19, 2018, Dkt. #148 at 6–7). Even though he had not yet spoken to an attorney, Cook signed documents at the meeting, including a retention agreement,[5] and made his first installment payment to Upright that day. (*Id.* at 7, 23). Cook continued to make payments over the next 14 months until finally receiving notification on August 29, 2014, that his attorney fees were paid in full. (Stip. ¶ 2).[6]

But it was not until October 3, 2014, that an Upright case manager emailed Cook to advise him that his petition review had been scheduled with an attorney. (UST Tr. Ex. 17). Attached to the email were drafts of a bankruptcy petition, schedules, and SOFA. (*Id.*). Several days later, Cook participated in a Skype meeting with Gallagher that lasted for more than an hour. (Cook at 8). On October 7, 2014, Gallagher commenced this chapter 7 proceeding for Cook by filing his petition, sworn Schedules A–J and SOFA. (UST Tr. Ex. 2). Ira Bodenstein was appointed

---

[5] Respondents stipulated on the record at trial that the original retention agreement has never been produced in this proceeding. (*See* Dkt. #147, Dec. 18, 2018 Tr. Test. at 202:2–6).

[6] According to the Statement of Financial Affairs ("SOFA") and other disclosures required by Fed. R. Bankr. P. 2016, Cook paid a total of $1,910 to LSC, comprised of $1,575 for attorney fees and $335 for the case filing fee. (UST Tr. Ex. 2)

as the chapter 7 Trustee on the case, and the section 341 meeting of creditors was set for

November 21, 2014. (Dkt. #6).

Six weeks after Cook's bankruptcy filing, on November 14, 2014, Levin sent an email to

Chern stating, in relevant part:

> He [Charles Cook] has a pending FDCPA case that was filed a few months ago.
> I saw in BKSN that his petition had been filed so I checked and his claim is not
> listed. The FDCPA case is set for a prove up hearing next week and we should
> get a default judgment of $1000 + fees. Last I checked the company was in
> business and it is local so we expect to collect.

(UST Tr. Ex. 19.) The same day, Chern forwarded Levin's email to Gallagher, with the following

instruction:

> Urgent David G. Please make sure creditor is listed on shed. F. Also make sure claim is
> disclosed on B and exempt on C. Must amend prior to 341 [sic] meeting and make sure
> TT is provided with copy of amendment. This is important so the debtor does not lose the
> right to the claim or i [sic] not otherwise estopped from asserting it.

(*Id.*).

Gallagher did not amend Cook's schedules before the 341 meeting. (Gallagher at 115).

Cook appeared at the meeting a week later with LSC attorney Emily Wood ("Wood"), and in

response to questions from the chapter 7 Trustee about anyone who owed Cook money, Wood

mentioned a "possible FDCPA claim." (Stip. ¶ 11). Three days later, on November 24, the

chapter 7 Trustee filed a report of no property available for distribution. (*Id.* ¶ 12). That same

day, after the Trustee report was issued, Gallagher filed an amended Schedule B disclosing an

FDCPA settlement with a value of $1,000 on Line 21, and an amended Schedule C claiming the

asset as exempt. (*Id.* ¶ 13). But the SOFA was not amended to add details about the FDCPA

case referenced in Levin's prior email. (*Id.*). Cook received a discharge on January 21, 2015.

(Stip. ¶ 14).

### B. Pre-Petition FDCPA Litigation

LSC attorneys had, in fact, represented Cook as a plaintiff in two lawsuits filed on his

behalf in the year preceding the bankruptcy filing. (Stip. ¶ 15). Neither lawsuit was included in

the draft schedules and SOFA prepared by LSC and transmitted to Cook, nor were they disclosed

on the filed bankruptcy documents. (UST Tr. Exs. 2, 17).

Cook's first FDCPA complaint was filed by Leibowitz on June 6, 2014, *Cook v.*

*Rushmore Service Center, LLC*, No. 14cv04180 (N.D. Ill. June 6, 2014); Levin submitted an

amended complaint a month later. (Stip. ¶¶ 16, 18). Around August 19, 2014, Rushmore paid

$3,500 to settle the suit, and on August 21, 2014, LSC filed a notice of voluntary dismissal. (Stip.

¶ 19). A day later, the $3,500 check from Rushmore was endorsed by "Upright Law" and

presented for payment. (Stip. ¶ 20). "Upright Litigation" then paid $790 to Cook on August 26,

2014. (Stip. ¶ 21).[7]

Cook's second FDCPA complaint was filed by Levin on June 30, 2014, *Charles Cook v.*

*Praxis Financial Solutions, Inc.*, No. 14cv04916 (N.D. Ill. June 30, 2014). (Stip. ¶¶ 22–23).

When Praxis failed to answer, a motion for default judgment was filed on October 20, 2014, and

granted three days later, with a prove-up hearing scheduled for November 20, 2014. (Stip. ¶¶ 24–

25.) The prove-up hearing was held in the district court on November 20—one day prior to

Cook's 341 meeting in the bankruptcy court—and afterwards, the following entry was made on

the docket:

> MINUTE entry before the Honorable Samuel Der-Yeghiayan: Prove-up hearing
> held. Plaintiff's request for default judgment in sum certain is granted. Judgment
> is hereby entered in favor of Plaintiff and against Defendant in the total amount
> of $5,132.50. Counsel for Plaintiff to provide the Court with a proposed draft

---

[7] Cook was actually entitled to receive $1,000 in damages, but Upright retained $210 to pay off the balance
due for attorney and filing fees in connection with Cook's anticipated bankruptcy case. (Dkt. #50, ¶ 4; UST Tr. Exs.
12, 14).

judgment order consistent with this Court's ruling. Mailed notice (mw,) (Entered: 11/20/2014)

(Stip. ¶ 26). On December 1, 2014, a judgment order was entered in favor of Cook in the amount of $5,132.50, comprised of $1,000 in actual damages, $1,000 in statutory damages, $2,672.50 for attorney fees, and $460 for costs. (*Id.* ¶ 27).

Although the *Praxis* lawsuit and judgment were property of the bankruptcy estate under 11 U.S.C. § 541, Cook, through his counsel, never consulted the chapter 7 Trustee regarding this asset. (Stip. ¶ 29). And no LSC attorney was ever employed by the estate under 11 U.S.C. § 327 or conferred authority to continue to litigate the claim after the bankruptcy filing on October 7, 2014. (*Id.*). On December 15, 2014, while the bankruptcy case was still pending and without authority to act on behalf of the bankruptcy estate, Levin settled *Praxis* for $3,600, payable by four checks of $900 each, postdated for January 15, February 15, March 15, and April 15, 2015. (*Id.* ¶ 30).

### III.    Upright Procedures Regarding FDCPA Litigation Disclosures

Chern played a significant role in setting up the litigation practice, and not only oversaw the group but also had supervisory responsibility with Levin, Leibowitz, and Allen. (Chern, Day 1 at 210–11). According to Chern, Upright had two established procedures in 2014 for communicating the existence of litigation matters to bankruptcy attorneys—the red flag entry by a litigation paralegal and a separate email from the litigation attorney. (*Id.* at 212–13). At trial, though, Upright presented examples of flag notations in only five cases and did not offer into evidence any emails between its litigation and bankruptcy attorneys about cases. (Upright Tr. Ex. 30; Chern, Day 1 at 216).

In fact, Jocelyn Galloway ("J. Galloway"), an associate attorney at Upright, explained that there were no formal disclosure procedures in place in 2014 or 2015. (Jocelyn Galloway Tr.

Test., Dec. 20, 2018, Dkt. #149 at 222–23). The record reflects that a meeting on this subject between the litigation and bankruptcy teams was scheduled in May 2015 and inexplicably cancelled. (UST Tr. Ex. 29; Chern, Day 1 at 216). Chern also pointed to a partner email template created in March 2016 to be used by onboarding attorneys after a client paid his or her fees in full to provide the partner attorney with relevant information regarding the client's case as another example of process. (Chern, Day 2 at 70; J. Galloway at 213–14; Upright Tr. Ex. 18). Finally, in December 2016, J. Galloway helped create a document entitled "Procedure for Scheduling Potential Claims," which was disseminated to attorneys who prepared preliminary drafts of bankruptcy petitions to be delivered to partner attorneys. (Chern, Day 2 at 61–62; Upright Tr. Ex. 15). The purpose of the document was to provide guidance regarding how to properly disclose consumer protection claims in bankruptcy petitions. (Chern, Day 2 at 61–62; J. Galloway at 209).

The December 2016 procedure was developed a month after the United States Trustee with oversight for cases in the Western District of Washington filed a similar sanctions motions against Upright based on alleged inadequate disclosures of consumer protection claims. *See In re Foster*, 586 B.R. 62 (W.D. Wash. 2018). Only then did Chern direct an associate attorney at the firm to identify all clients whom Upright had represented in litigation and also had an open bankruptcy case in that district. (Chern, Day 2 at 47). Following that investigation, Upright amended some client schedules and SOFAs. (*Id.* at 47–48).

After the UST filed this sanctions motion in the summer of 2017, Chern ordered his employees to undertake a broader nationwide review of all Upright filings since 2014. (Chern, Day 1 at 230–31). The summary chart of those results reflected widespread omissions in 2014, 2015, and 2016. (UST Tr. Ex. 96). Notwithstanding their knowledge of these problems, Upright

did not take any action to notify the affected clients, to file corrected documents in their cases, or to refund attorney fees. (Chern, Day 1 at 180–81).

## IV.    UST Motions for Relief Against Respondents

### A.  Sanctions and Other Relief

In June 2017, the UST moved to reopen Cook's bankruptcy case in order to pursue sanctions for the misleading filings, specifically a civil penalty and injunction against LSC under 11 U.S.C. § 526(a)(2). (Dkt. #23). Furthermore, the UST asked that pursuant to 11 U.S.C. § 105, Allen, Chern, and Gallagher be censured and ordered to complete a professional responsibility course for their role in preparing and filing materially inaccurate sworn statements and concealing an FDCPA lawsuit in Cook's case. Finally, the UST sought an award of fees and costs.

In response, Respondents countered that mistakes were made that amounted to nothing more than harmless error. (Dkt. #32). At most, they contended, one case contained improper disclosures, which was not enough to demonstrate a sufficient pattern or practice.

### B.  Examine Fees and Disqualify Gallagher and Upright

In the midst of discovery on the sanctions motion, the UST filed a second motion in March 2018, seeking examination of fees and disqualification of Gallagher and Upright as counsel for Cook. (Dkt. #50). Specifically, the motion invoked 11 U.S.C. §§ 105 and 329 and sought the following relief: (1) to order Upright to refund all fees paid by Cook; (2) to cancel the retention agreement; and (3) to disqualify Gallagher and Upright from representing Cook at his upcoming deposition regarding the UST's sanctions request. The UST contended that in light of the allegations raised in this case, a conflict existed between the interests of counsel and the firm

and Cook as their client, such that Cook's fees should be returned so that he could hire his own lawyer.

Gallagher and Upright responded that the first point was moot, since the firm had just mailed a refund of the $1,575 attorney fee to the chapter 7 Trustee on April 18, 2018. (UST Tr. Ex. 33). Furthermore, they asserted, Gallagher had also filed amended Schedule A/B on April 3, 2018, disclosing the *Rushmore* pre-petition payment to Cook of $790, and claiming that amount as a remaining exemption on Schedule C, as well as an amended SOFA disclosing the existence of both the *Rushmore* and *Praxis* lawsuits, and attorney fees paid to Upright. (Dkt. ##53, 54). Moreover, they disagreed that a conflict existed but asserted even if that were true, Cook expressly waived any conflict in writing. (Dkt. #69).

The motion to examine/disqualify was set for an evidentiary hearing on August 1, 2018. (Dkt. #88). The main concern of the court was whether Cook needed independent advice as to how he should proceed. (Transcript of June 13, 2018 Hearing, Dkt. #99). As such, even though the UST was not seeking recourse against Cook personally, the court requested that the Clerk of the Court determine if a member of the volunteer attorney panel would be willing to accept a limited assignment in this disputed matter, representing Cook at his deposition only as *pro bono* counsel. [8]  Attorneys Cathy Steege and Bill Williams of the law firm of Jenner & Block, LLC subsequently agreed to assist, and after discussions with Cook, he chose to retain them for the remainder of the proceedings. [9]  Because his attorney fee had already been refunded and Upright was no longer representing Cook, the August 1 hearing date was stricken. (Dkt. #108).

---

[8] *See U.S. Bankruptcy Court Volunteer Attorney Panel*, UNITED STATES BANKRUPTCY COURT, NORTHERN DISTRICT OF ILLINOIS, https://www.ilnb.uscourts.gov/us-bankruptcy-court-volunteer-attorney-panel

[9] The court expresses its sincere gratitude to Ms. Steege and Mr. Williams for their willingness to provide *pro bono* representation to Mr. Cook. Their service to the public and the court is truly appreciated.

A trial was held on the pending motions on December 18–20, 2018, and post-trial submissions were timely filed on March 15, 2019.

## JURISDICTION

The court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 151. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## DISCUSSION

Respondents admitted that Upright repeatedly failed to disclose FDCPA lawsuits in bankruptcy cases where the firm also represented debtors as plaintiffs, and that the quality of legal services provided to Cook was substandard. (Chern, Day 1 at 161–64). The task for the court, then, was to decide if sanctions should be imposed for the past deficiencies, particularly now that Upright allegedly had measures in place to prevent further instances of noncompliance with the Bankruptcy Code, and the bankruptcy fees paid by Cook had been "voluntarily" disgorged. But the litigation process here has been bogged down by antics that call into question the good faith nature of these actions. For example, Respondent initially conceded mistakes had been made (Dkt. #32), but counsel still threatened and then filed a baseless Rule 9011 motion against the UST on the grounds that *some* disclosures had been made in *some* cases. (Dkt. #31).[10] The motion was easily denied as not "well-taken." (Transcript of August 5, 2017 Hearing at 7– 10, Dkt. #37).[11]

---

[10] Specifically, Respondents identified one case where the UST alleged no disclosure had been made in a SOFA, when the settlement payment was listed under a different section. The UST acknowledged that minor error. *See* Upright Mot. at 4 n.2, Dkt. #31. But for the most part, Respondents' own Rule 9011 motion reflects that as alleged in the four cases cited by the UST, they failed to include required information about FDCPA lawsuits on Schedule B or A/B, Schedule C *and* the SOFA. *Id.* at pp. 6–7.

[11] Respondents now express "regret [about] having filed the Rule 9011 Motion." (Resp. Post-Tr. Br. at 15, Dkt. #153).

Discovery appeared to be proceeding cooperatively until Respondents added new lead counsel to their team. (Dkt. #46). Suddenly, document production was delayed as Respondents asserted vague privilege objections without providing a supporting log in accordance with Fed. R. Civ. P. 26 (made applicable by Fed. R. Bankr. P. 7026). Next, Respondents sought to stay discovery altogether based on a creative claim-preclusion theory that an Illinois-based bankruptcy judge would be bound by the outcome of a similar sanctions request against Upright in *Foster*, even though that case involved different debtors in a different state, was filed by the United States Trustee over a different region, and pending before a Washington-based bankruptcy judge. (Dkt. #47). That novel premise was soundly rejected. (Transcript of Mar. 7, 2018 Hearing, Dkt. #52). Undeterred, Respondents waited until five days before Gallagher's scheduled deposition to assert a frivolous privilege objection and clawback request for a key email that had been voluntarily produced by counsel a month earlier. In response, the UST sought and was awarded monetary sanctions. (*See* Order Granting UST Mot. to Compel and Supp. Request for Costs entered June 27, 2018, Dkt. #95).

Even as the court urged the parties to focus on the merits of the allegations in this case, Respondents continued to demand specific information from the UST about its regional structure and any communications between offices about litigation against Upright, on the grounds that these details were relevant for establishing privity for a claim-preclusion defense. (By that point, the *Foster* court had declined to impose a civil penalty for Upright's violations of § 526(a). *See In re Foster*, 586 B.R. 62 (Bankr. W.D. Wash. 2018)). Again, that theory was rebuffed. (*See* Order Granting in Part and Denying in Part UST Mot. for Protective Order, Dkt. #90).

In an effort to get the case back on track, the court held an extended discovery conference with the parties to resolve outstanding requests. (*See* Dkt. ##115, 118, 120). Agreed deadlines

to complete certain tasks, such as Respondents producing an updated privilege log and contacting

other affected debtors about conflict waivers, and both parties finishing up depositions, were set.

Nevertheless, Respondents' counsel appeared at the next status hearing, offering no good excuse

for his noncompliance with the court's order. While counsel did offer to reimburse the UST for

two hours of attorney time and the court reporter fee after neither he nor his client appeared for

a scheduled Rule 30(b)(6) deposition, the court advised that additional penalties would have been

imposed had the UST asked, as the oversight smacked of gamesmanship, not an innocent

mistake. (Transcript of Aug. 30, 2018 Hearing, Dkt. #90).

Finally, for the third time, Respondents pressed the claim-preclusion defense in their

pretrial materials.[12] Counsel insisted it should be considered at trial and thus objected to the

UST's proposed use of a summary chart that detailed all bankruptcy cases filed by Upright

nationally with inaccurate disclosures which had also been used at the *Foster* trial. (*See* Dkt.

##134, 139–41). Finding this tactic wholly unprofessional, the court issued a stern rebuke to

counsel along with a threat of sanctions under Fed. R. Bankr. P. 9011 for continued improper

conduct. (*See* Transcript of Dec. 12, 2018, Dkt. #146). The UST also asked the court to sanction

David Menditto, Respondents' counsel, and Upright for the latest harassing behavior that forced

the UST to file a last-minute motion in limine on the eve of trial; the request was taken under

advisement. (Dkt. #142). Respondents' counsel subsequently filed a notice of no objection to

an award of attorney fees in connection with the collateral estoppel pleading. (Dkt. #150).

---

[12] Counsel had previously represented that Respondents would raise the claim-preclusion issue in a summary judgment filing for this court to fully consider their arguments prior to trial, but no such request for leave to submit was ever made, let alone a brief with supporting authorities presented for consideration.

The history of contentious dealings from the time the UST reopened this chapter 7 case to seek sanctions in June 2017 through a year of discovery and the ensuing trial is relevant to this court's analysis of the pending motions for sanctions.

The UST's overarching complaint is that Cook received "fundamentally deficient legal services" in his bankruptcy case, for which sanctions should be imposed. (UST Post-Tr. Br., Dkt. #152). Respondents maintain that they have taken appropriate and timely steps to fix problems with properly accounting for FDCPA litigation and refunded Cook's attorney fees; therefore, no further action is needed here. (Resp. Post-Tr. Br., Dkt. #153). Upon review of the evidence and testimony in this case and the post-trial filings, the court finds the position of the UST far more convincing and thus grants the requested relief, with one exception.

## I.  Civil Penalty Against LSC for Section 526(a)(2) Violation

### A.  Statutory Violation

The UST asserts that Upright violated 11 U.S.C. § 526(a)(2) which, in relevant part, prohibits a debt relief agency from:

> mak[ing] any statement, or counsel[ing] or advis[ing] any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading.[13]

At trial, Chern conceded Upright violated this provision, but that was mostly a self-serving and belated admission given the undisputed facts about several years of bankruptcy filings containing untrue and misleading statements relating to FDCPA litigation undertaken by Upright. Regarding Cook specifically, his bankruptcy petition was filed by Upright on October 7, 2014, with no mention of the two FDCPA lawsuits also filed on his behalf by Upright, that should have

---

[13] Neither side has contested whether Upright qualifies as a "debt relief agency" and or debtors like Cook are "an assisted person."

been listed on his sworn and verified schedules and SOFA. *Rushmore* had been settled for $3,500 in August 2014—a mere month earlier—and Upright had retained $210 to pay off the balance due for Cook's bankruptcy fees before remitting the remainder. (UST Tr. Ex. 3). *Praxis* had been filed in June 2014 and was still pending; in fact, Levin moved for a default judgment on the same day that Gallagher filed Cook's bankruptcy petition. (UST Tr. Ex. 6; Dkt. #9). Not once has Upright offered a plausible explanation for the multiple omissions in the *Cook* filings:

- ■ Schedule B – Personal Property, Question 21: "[o]ther contingent and unliquidated claims of every nature" – did not list the *Praxis* lawsuit;

- ■ Schedule C – Property Claimed As Exempt: did not list $790 received by Cook two months earlier for *Rushmore* or the anticipated $1000 in statutory damages from the *Praxis* suit;

- ■ SOFA, Question 2: "income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case" – did not list the *Rushmore* payment;

- ■ SOFA, Question 4a: list all suits "to which the debtor is or was a party within **one year** preceding the filing of this bankruptcy case" – did not list *Rushmore* or *Praxis*, let alone any identifying case information (caption of suit, case number, nature of proceeding, court location, and status);[14]

- ■ SOFA, Question 10:  asks about transfers of all other property other than in the ordinary course of the business or financial affairs of the debtor, within **two years** of the case filing – did not list the pre-petition payment of attorney fees to Upright in connection with the *Rushmore* litigation.[15]

These errors are especially troubling because Upright was the same law firm that represented Cook in his bankruptcy case *and* FDCPA cases, and all were filed within months of another. Yet no one noticed any of these oversights until one day before the section 341 meeting of creditors. True, Levin emailed Chern about the pending *Praxis* settlement, and Chern, in turn,

---

[14] Only a pending lawsuit filed by Capital One against Cook is listed. (UST Tr. Ex. 2, at 29).

[15] But counsel did include a 2012 trade-in for a new vehicle by Cook. (UST Tr. Ex. 2, at 31).

emailed Gallagher about the need for amendments. However, no mention was made of the *Rushmore* case which Levin had just settled. Wood, who was covering Cook's 341 meeting for Gallagher, did advise the chapter 7 Trustee about the possible settlement, and Gallagher followed up by subsequently amending Schedules B and C the next day to list a possible FDCPA claim for $1,000 as fully exempt, but those filings were made *after* the chapter 7 Trustee had already concluded no assets existed for distribution to creditors. Furthermore, the SOFA was not amended to add the *Praxis* case, even though Levin was aware of the lawsuit, nor was the creditor added to Schedule F, as Chern had directed. At best, these amendments were a half-hearted attempt to fix some deficiencies, as opposed to a good faith effort to update incomplete filings with full disclosures of information reasonably and actually known to counsel.

Looking beyond Cook's individual case, the court finds ample evidence of the same pattern of inaccuracies in quite a few of Upright's bankruptcy filings. The firm initially conceded the same in at least four of the Illinois cases cited by the UST, *supra* fn.10, and after trial, acknowledged shortcomings in at seven Illinois cases, Upright Post-Tr. Br. at 3. Further, Chern made no attempt to dispute the summary chart of nationwide bankruptcy filings by Upright from 2014–2016 omitting FDCPA litigation. (Chern, Day 1, at 177–81). In other words, the failure to disclose material details impacted scores of debtors represented by Upright. That Upright now confesses *mea culpa* for these repeated statutory violations is disingenuous, especially when it also seeks to minimize culpability on the ground that while the disclosures did not "strictly comply with the Bankruptcy Code," they were sufficient enough to "adequately disclose" the asset so that the chapter 7 Trustee could investigate the claim. (Upright Post-Tr. Br. at 4).

That short-sighted position misses the point of statutory provisions like § 526(a)(2) that are codified in a section entitled "Restrictions on debt relief agencies." The prohibition against

making untrue or misleading statements in bankruptcy cases is expressly designed to protect unsophisticated individuals in financial distress who rely on debt relief agencies for proper guidance. *See, e.g., Milavetz v. United States*, 130 S. Ct. 1324, 1339–40 (2010) (upholding the disclosure requirements for debt relief agencies under § 528 of the Code as reasonably related to the legitimate governmental interest of preventing deception of consumers). Upright may have done the bare minimum to alert the chapter 7 Trustee about the possibility of an asset of value. However, that does not relieve the firm of its obligation as a debt relief agency to make accurate statements in filings.

Upright insists that its management took steps to address the discrepancies in bankruptcy filings once apprised of the problem, but the evidence belies that contention. First, the bankruptcy and litigation groups at Upright operated separately and distinctly—each used different databases, sat in different areas of the office, and were supervised and trained by different attorneys. Upright points to vague testimony from multiple witnesses about ongoing discussions between the litigation and bankruptcy groups concerning the proper reporting of litigation claims, none of which can be described as a defined process. In fact, the one meeting scheduled in May 2015 between those attorneys to discuss this very issue was cancelled.

As lead partner of the FDCPA Practice, Levin was able to retrieve information from BKSN, the bankruptcy software system, as established by his email to Chern about Cook's case, but Levin and Gallagher testified consistently that Upright attorneys in the two groups did not have regular access to each system. In other words, the right hand had no way of knowing what the left hand was doing. Presumably, that was the reasoning behind the "Every Case Practice," developed by Leibowitz, Upright's General Counsel. A generic disclosure of a possible FDCPA litigation in every bankruptcy case, whether counsel knew of a claim or not, would potentially

provide cover for these types of situations where the information had been missed. But once that practice was soundly criticized by chapter 7 Trustees nationwide and immediately abandoned by Upright in June 2014, management appears to have given little thought to actually developing an effective system to ensure that the litigation and bankruptcy attorneys were communicating relevant information about existing or settled claims that needed to be disclosed in bankruptcy filings.

Second, the red-flag and email system could possibly be deemed an established process, but Upright failed to show that it existed, let alone was consistently followed. According to Levin, his group filed hundreds of FDCPA litigation claims over two years, but Upright managed to identify only *five* cases containing red-flag entries and not a single email communication between litigation and bankruptcy attorneys about case filings. Considering this was Upright's primary defense to the sanctions motion, the firm could have presented Elliott, a former litigation paralegal, at trial to offer corroborating testimony about her efforts in this regard, particularly in light of the paucity of documentation. But Upright did not, which left a gaping hole on such a crucial point.[16]

Third, Upright did create an onboarding script in March 2016 for bankruptcy paralegals to ask clients about the existence of potential consumer protection claims, but that procedure was clearly designed for the purpose of soliciting case leads. (*See* Upright Tr. Ex. 16, question 12). Nowhere does the script discuss the relevant inquiry: steps the bankruptcy group should take prior to filing a case to determine if litigation claims or lawsuits exist that must be disclosed in bankruptcy documents. At most, it appears that by December 2016, Upright had finally

---

[16] Elliott was listed on the UST's witness list as a "may call." The parties did indicate that she may have relocated to Denver, Colorado. But the court cannot think of any reason why in the year this motion was pending and discovery was ongoing, Upright could not have tracked her down to obtain support for its position here.

developed a basic written "Procedure for Scheduling Claims" for its bankruptcy attorneys. (*See* Upright Tr. Ex. 15). Of course, that was created only in response to the motion for sanctions filed by the United States Trustee for the Western Region in *Foster*. More importantly, by then, it had been well over two years since the last formal process—the Every Case Practice—was discontinued. The summary chart reflecting numerous instances of undisclosed FDCPA litigation on schedules and SOFAs in 2014, 2015, and into 2016, aptly demonstrates the result of Upright's failure to take affirmative action sooner.

Significantly, Chern acknowledged that to this very day Upright has done nothing to voluntarily rectify the errors identified in those cases. Even the amendments in Cook's case were made nine months after the UST filed this sanctions motion, and that still did not happen until the UST filed a subsequent motion questioning whether Gallagher and Upright could ethically continue to represent Cook in these proceedings. Once again, the "corrective action" by Upright appears to be motivated primarily by an intent to moot matters and avoid further scrutiny from the UST and the courts, not a genuine desire to correct mistakes and limit prejudice to its clients.

## B. **Remedy**

With the ongoing statutory violations firmly established, the court considers the UST's request under 11 U.S.C. § 526(c)(5)(B) to impose a civil penalty of not less than $5,000 against Upright for engaging in a clear and consistent pattern or practice of filing untrue or misleading bankruptcy case documents. The evidence in this case easily meets the criteria for imposition of a civil penalty. Upright concedes that in *Cook* and at least seven more cases filed in Illinois alone, the documents were inaccurate, incomplete, or both. (Upright Post-Tr. Br. at 3–4). While that number constitutes a small fraction of the overall bankruptcy filings, when considered along with the summary chart, it is clear that these omissions were not merely isolated incidents.

Instead, this was a recurring problem primarily because Upright failed to establish a proper reporting process, which, in turn, led to a consistent pattern of inaccurate filings that ended only when the firm decided to shut down the unprofitable consumer litigation group.[17] A civil penalty for repeated violations of its statutory obligations and the choice to bury its head in the sand and ignore an obvious issue is therefore appropriate.

Upright insists that, if anything, a minor monetary sanction is warranted because these were harmless errors that did not affect any substantial rights, but that attitude demonstrates the firm's failure to appreciate the gravity of the situation. First, the integrity of the bankruptcy process is at stake when filed documents do not accurately reflect the debtor's true financial situation. Innocent mistakes can certainly occur, but that does not excuse debtors who affirm the truthfulness of statements contained in bankruptcy documents under penalty of perjury or their counsel who serve as officers of the court from making an honest effort to ensure that disclosures are thorough and accurate. *See Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1274 (11th Cir. 2010) (emphasizing that "a debtor seeking shelter under the bankruptcy laws has a statutory duty to disclose all assets, or potential assets to the bankruptcy court").

Furthermore, full disclosure of all pertinent information is necessary to ensure that the system of checks and balances works. By administering a pre-petition claim that belonged to the bankruptcy estate—the *Praxis* lawsuit—without authorization from the chapter 7 Trustee or approval of the court, Upright escaped oversight of its actions under 11 U.S.C. § 329. The chapter 7 Trustee likely would have abandoned such a small claim for approximately $5,000, but

---

[17] Interestingly, Leibowitz and Levin each testified under oath here that the litigation practice disbanded in late 2015/early 2016 due to unprofitability, (Leibowitz at 22; Levin at 97, 99), and Respondents reiterated the same in their Proposed Findings of Fact (Dkt. #154, ¶ 53) and Post-Trial Brief (Dkt. #153 at 15). But according to the parties' stipulations in *Foster*, Upright did not stop taking on new FDCPA clients until May 2017, and Chern testified there that "it's possible" Upright might return to representing clients in consumer protection litigation. *See Foster*, 586 B.R. at 81 ¶ 109.

that was his decision to make, not Upright's. *See In re Varan*, 2014 WL 2881162 at *7 (Bankr. N.D. Ill. June 24, 2014) ("Disclosure is mandatory even if a debtor believes an asset to be worthless or unavailable to the bankruptcy estate.").

Equally concerning is Upright's failure to acknowledge that its reckless actions may subject clients to potential harm, as inaccurate disclosures put their discharges at risk under 11 U.S.C. § 727(a). *See In re Chlad*, 922 F.3d 856, 860 (7th Cir. 2019). A debtor "who has not been honest and forthcoming—particularly in connection with the bankruptcy case itself—does not deserve that privilege" of obtaining a discharge from debts. *BMO Harris Bank v. Brahos*, 589 B.R. 381, 393 (Bankr. N.D. Ill. 2018). Here, Cook testified convincingly that he was confused about when the FDCPA cases had been filed on his behalf and any requirement to disclose that information on his bankruptcy filings. (Cook at 9-10). He also described in detail the added anguish and stress that these reopened proceedings have caused him financially and personally. (*Id.* at 12–13, 28–29). Although the UST is not pursuing action against Cook or other debtors represented by Upright whose filings wrongfully omitted FDCPA litigation, another creditor who otherwise might have received a recovery from the Estate could take the opposite position. *See, e.g., Brahos*, 589 B.R. at 396–99. Debtors would then be forced to hire counsel to protect their discharges after having already paid Upright for representation.

Even worse, concealing assets and making false declarations on bankruptcy documents could lead to criminal charges against debtors. *See United States v. Fadden*, 874 F.3d 979 (7th Cir. 2017). And, finally, as Chern recognized in his email to Gallagher, Cook and other debtors could find themselves judicially estopped from pursuing litigation omitted from their bankruptcy schedules. *See Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 547 (7th Cir. 2014) ("Manipulation may occur when a debtor deliberately conceals a contingent or unliquidated

claim during bankruptcy proceedings and then later seeks to profit from that claim after obtaining a discharge of her debts."). Those are all significant rights the court deems worthy of protection.

In sum, the record reflects that Upright's business model was centered around using its bankruptcy clients as the primary source of potential plaintiffs for FDCPA cases. Litigation cases would generate statutory attorney fees to the firm and a minor recovery to the plaintiff that could be used to fund a pending bankruptcy filing.[18] Upright's script required consultants to ask bankruptcy clients if they had been receiving harassing phone calls from creditors and to diligently track that information on a spreadsheet to be given to Upright. And the marketing campaign to potential partners emphasized the ability to generate "cost free revenue from your existing client base" and to "[a]ccelerate payment of your bankruptcy fees by applying client's proceeds of FDCPA settlements." (UST Tr. Ex. 86). As such, Upright should have been far more proactive about implementing a simple method for bankruptcy attorneys to determine if clients had ongoing or recently resolved FDCPA litigation initiated by the firm.

Imposition of a civil penalty under § 526(c)(5)(B) is discretionary but "largely motivated by factors of deterrence and the culpability of the parties." *In re Huffman*, 505 B.R. 726, 766 (S.D. Miss. 2014). The need for deterrence is significant here. Upright ended the consumer litigation practice due to unprofitability, but with a new management committee structure in place and a process on paper, at least, the group could easily be revived. Deterring future misconduct once Upright is no longer facing a threat of sanctions from the UST is necessary. Furthermore, Upright's culpability is clear. There is ample evidence of a consistent pattern of nondisclosures over a three-year period, which even Upright cannot dispute. And these ongoing violations

---

[18] One SalesForce note explicitly states that a client receiving funds from a litigation settlement "should spend down before filing" (Upright Tr. Ex. 30 at 003), presumably to avoid a request for turnover of those funds to the chapter 7 Trustee.

occurred in cases where Upright still has not taken any corrective action, such as notifying clients of the issues or taking other steps to protect their interests.

After taking all those factors into consideration, the court concludes that a civil penalty of $10,000 against Upright is warranted. This is minor enough given their annual revenues to avoid being punitive but significant enough to ensure compliance in the future.

## II.   <u>Censure and Completion of a Professional Responsibility Course</u>

In light of the errors in Cook's case, the UST asks for sanctions to be imposed under 11 U.S.C. § 105 against Gallagher for his representation as counsel of record for Cook, and Allen and Chern for failing to properly supervise Gallagher. The UST seeks a censure and order to attend ethics and professional responsibility courses.

The court agrees that Cook deserved far better services and consideration from the counsel he paid to represent him in this case. However, the court does not find a basis upon which to sanction Gallagher personally. While there were certainly instances where he should have been more diligent about amendments—a fact Gallagher acknowledged—those oversights do not rise to the level of sanctionable behavior. Overall, nothing here suggests that Gallagher acted maliciously, deceitfully, or unethically. He did file some amendments after the 341 meeting that minimally disclosed a pending claim belonging to the Estate. That the complete amendments were not made until nine months into this contested matter and Gallagher provided questionable advice to Cook on the conflict of interest waiver issue, is not enough to sanction him. Gallagher testified that once this litigation was underway, his actions, in large part, were dictated by his counsel. (Gallagher at 59–61). The court found that explanation believable and Gallagher to be a credible witness whose representation of Cook during this proceeding was attributable to the litigation strategy of Respondents' counsel, rather than a dereliction of his

professional obligations. Gallagher was junior counsel following orders, not the decisionmaker. It would be patently unfair to penalize an attorney who has had an otherwise unblemished record for his firm's unreasonable defense tactics.

As for Allen and Chern, the court concludes that these specific sanctions are not warranted against them either. It is true that the court can hold them liable as owners of the firm and Gallagher's "supervisors" for wrongdoing by counsel of record, *see In re Tabor*, 583 B.R. 155, 189–90 (Bankr. N.D. Ill. 2018), but the court declines to do so under these circumstances. Both Allen and Chern are lawyers with extensive consumer bankruptcy and management experience, but as far as the court can tell, neither held themselves out to Upright clients as practitioners. Instead, they managed the firm and provided high-level supervision of the litigation and bankruptcy attorneys. The shortcomings that occurred in Cook's case stemmed from a flawed business model that affected multiple clients, not from their failure to properly represent an individual debtor. Censuring Allen and Chern and ordering attendance at ethics training would be a punishment that does not fit the crime. That request is therefore denied.

### III.    <u>Disgorge All Fees Collected from the *Rushmore* Settlement</u>

The UST contends that disgorgement of all fees collected by Upright in connection with the firm's representations of Cook should be ordered pursuant to 11 U.S.C. § 329. (UST Post-Tr. Br. at 6). Upright maintains that its voluntary refund of attorney fees paid by Cook for his bankruptcy filing and the total fees received for the *Praxis* settlement—albeit only after the UST filed a motion to examine—is sufficient. (Upright Post-Tr. Br. at 16–17). The UST insists that Upright should not be allowed to keep its portion of the pre-petition *Rushmore* settlement either. This court agrees.

Section 329 of the Bankruptcy Code requires attorneys representing a debtor to file with the court a statement of compensation paid or agreed to be paid "for services rendered or to be rendered in contemplation of or in connection with the case by such attorney." *See also* Fed. R. Bankr. P. 2016(b) (requiring counsel to file the same with the U.S. Trustee). Upright has not shown that the *Rushmore* FDCPA litigation filed for Cook was not also undertaken in connection with Cook's bankruptcy case. Indeed, Upright actively encouraged bankruptcy clients to pursue FDCPA litigation and use any recovery to pay off total fees due on a bankruptcy case sooner. That is exactly what occurred here—Cook was to receive $1,000 in damages as part of the *Rushmore* settlement and Upright retained $210, the balance due for his bankruptcy fees. The firm openly marketed the financing of bankruptcy cases as a concrete benefit to potential partner attorneys and debtors of pursuing these litigation matters. Because the *Rushmore* pre-petition litigation was intertwined with and connected to Cook's bankruptcy case, the FDCPA-related fees as well as the retention agreement should have been disclosed in accordance with Rule 2016(b). *See Foster*, 586 B.R. at 84.

The appropriate sanction for failure to comply with the Rule 2016 obligation here is to require disgorgement of the $2,500 received directly by Upright. In doing so, the court exercises its statutory authority under § 329 and its inherent power under 11 U.S.C. § 105(a) to fashion a remedy that adequately reaches the culpable parties. *See In re Rimsat*, 212 F.3d 1039, 1048–49 (7th Cir. 2000). To allow Upright to retain any of those funds and essentially profit from representing Cook under the unfortunate circumstances that he endured as a client would lead to a windfall that is not deserved.

## IV.    UST Attorney Fee Award against Chern and Allen

Based on the totality of the situation, the court concludes that Upright abused the judicial process in this case, and that Allen and Chern, as principals of the firm and named respondents against whom sanctions were sought, should be held accountable for those actions. The court has already recounted the unduly burdensome discovery process and pretrial antics that should not have occurred. Upright vexatiously extended the litigation process by, on the one hand, waiving the white flag and appearing to cooperate with the UST, while on the other hand, engaging in multiple discovery abuses and pushing unreasonable litigation positions. The sole purpose for that conduct was to frustrate the UST and the judicial process, plain and simple. Allen and Chern have every right to zealously defend themselves and their business in a case that was aggressively litigated on both sides, but engaging in gamesmanship that wastes the limited resources of the judicial system will neither be tolerated nor rewarded.

Therefore, Allen and Chern will be held jointly and severally liable for reasonable attorney fees and costs incurred by the UST in this entire proceeding since the case was reopened, excluding any amounts already awarded by the court.

### CONCLUSION

The UST motions for sanctions and examination of fees are granted as follows:

(1)    Law Solutions Chicago LLC d/b/a Upright Law LLC is assessed a civil penalty of $10,000, payable to the United States Trustee within 21 days of entry of this order;

(2)    Law Solutions Chicago LLC d/b/a Upright Law LLC is ordered to disgorge the sum of $2,500 for attorney fees and costs received in the *Rushmore* matter to the chapter 7 Trustee within 21 days of entry of this order; and

    (3)    Jason Allen and Kevin Chern are ordered to pay reasonable attorney fees and costs

incurred by the United States Trustee for prosecuting these motions.

        a.    The UST shall submit an itemized request for reimbursement within 21

days of entry of this order;

        b.    Allen and Chern shall have 14 days to file any objections;

        c.    The court will rule by mail.

**IT IS SO ORDERED.**

DATED: December 17, 2019

The Honorable LaShonda A. Hunt
United States Bankruptcy Judge